## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| DR. CARLA CAMPBELL-JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| v. | ) | |
| | ) | **JURY DEMANDED** |
| STATE FARM INSURANCE | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Dr. Carla Campbell-Jackson ("Dr. Campbell-Jackson"), by and through her attorneys, Hart McLaughlin & Eldridge, LLC, and Ben Crump Law, states as follows for her Complaint against State Farm Insurance ("State Farm"):

## <u>INTRODUCTION</u>

1.     After a distinguished 28-year career with State Farm, Dr. Campbell-Jackson was terminated because she complained about State Farm's rampant culture of racism and discrimination which permeated throughout her time at State Farm, creating a hostile work environment.

2.     As an African American woman, Dr. Campbell-Jackson confronted State Farm's culture of racism, discrimination, and retaliation day-in-and-day-out for decades.

3.     In late 2014, Dr. Campbell-Jackson was reassigned to the Special Investigations Unit handling alleged fraudulent insurance claims. Throughout 2015, Dr. Campbell-Jackson noticed a trend with minority group members' claims being

systematically and illegally denied by State Farm. She expressed her concerns to State Farm leadership, including to Human Resources and through State Farm's Code of Conduct (a purportedly anonymous reporting practice) about the blatant racism and discrimination against State Farm customers. Shockingly, Dr. Campbell-Jackson's concerns were either ignored or met with outright hostility by State Farm.

4.    In April 2016, State Farm's culture of racism and discrimination culminated in the form of a letter that, based on information and belief, was sent by a group of State Farm employees to Dr. Campbell-Jackson and other minority employees of State Farm. The letter was filled with blatantly racist and discriminatory language, including calling Hispanics "lazy," African Americans "uneducated" and "crackheads," Muslims "bottom of the barrel," and stating that State Farm executives did not want to employ minorities.

have all heard the rumors about the silent majority writing something about Hispanish, Jacks and, Muslims on the bathroom walls.  ALERT. A lot of us agree with our next President. We thank President Trump and no one can force us not to exercise our right to vote. Hispanish are lazy and cannot speak English well. Blacks are uneducated (maybe one or two exceptions) and Muslims are at the bottom of the barrel with the Hispanish. Inside secret.We drove to Bloomington, Illinois (Hispanish, that's where the State Farm home office is located). When Trump came to Bloomington, there where thousands of us there and we saw a LOT of State Farm employees and a LOT of State Farm executives. They really do not want minorities at State Farm, but the executives have to keep it inside.

When the mass shooting happened in Kalamazoo, the silent majority knew they were going to try to turn it into a race issue. We had bets going because we just knew it.When most of the victims were White, they could not turn it into a race thing. Then the money hungry "so called community leaders and preachers" tried to say that Abby (the sweet little White girl) received all the donations and that Tiana (the crackhead and unmarried mother) did not receive anything. A State Farm employee's relative and their "church" collected thousands of dollars for the black victim and nothing for Abby. If the silent majority did that it would be an uproar. The black churches are scams anyway. The silent majority members were not happy that they brought posters and flyers into the building and placed them all around our workplace begging for money for the black lady only.

5.      Shortly after Dr. Campbell-Jackson expressed concerns about the letter, she was terminated in retaliation for articulating concerns relating to this blatantly racist and unacceptable conduct.

6.      In an attempt to abruptly back-peddle away from the wrongful and illegal termination of Dr. Campbell-Jackson, State Farm offered to pay Dr. Campbell-Jackson $175,000.00 in hush money which Dr. Campbell-Jackson rejected.

**5.  Payment of Settlement Proceeds**

In consideration for Campbell-Jackson's agreement to all of the terms, conditions, and promises in this Agreement, State Farm agrees to pay the total amount of One Hundred Seventy-Five Thousand Three Hundred Fifteen Dollars ($ 175,315.00), in full and complete settlement of all claims that were or could have been asserted by Campbell-Jackson and any other claims that she has or could have asserted in any other forum or proceeding that arose prior to the date she executes this Agreement (the "Settlement Payments").  The Settlement Payment will be delivered to Campbell-Jackson within 15 days but no sooner than seven days of the execution of this Agreement as follows:

7.      Dr. Campbell-Jackson subsequently filed a complaint and Charge of Discrimination with the federal Equal Employment Opportunity Commission ("E.E.O.C.").

8.      Following an extensive and thorough years long investigation, the E.E.O.C. confirmed that State Farm did – in fact – engage in conduct that violated Dr. Campbell-Jackson's rights and recommended that State Farm pay Dr. Campbell-Jackson nearly $500,000 in compensatory and punitive damages as well as institute various reforms within State Farm to stop the pattern and practices of race-based discrimination and hostile work environment.



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Detroit Field Office**

477 Michigan Avenue, Room 865
Detroit, MI 48226
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
Detroit Status Line: (866) 408-8075
Detroit Direct Dial: (313) 226-7638
TTY (313) 226-7599
FAX (313) 226-2778

Charge No.: 471-2016-02383

Carla Campbell-Jackson

Charging Party

State Farm
5528 Portage Road
Portage, MI 49002

Respondent

## DETERMINATION

The Charging Party worked at the Respondent's 5528 Portage Road, Portage, Michigan location. Charging Party complained of harassment based on her race on April 26, 2016 after receiving a letter on April 25, 2016 which contained offensive language regarding her race. The Respondent failed to take prompt and appropriate action regarding this harassment. The Charging Party alleged that she was discharged on May 9, 2016 in retaliation for having complained about the harassment. The evidence supports a violation for these Title VII allegations that the Charging Party was harassed due to her race and discharged in retaliation for complaining about harassment. Like and related and growing out of the investigation, the evidence supports a reasonable cause finding for a class of ten individuals who were also subjected to harassment based on their race (African-American) and/or religion (Muslim) after the Respondent failed to take prompt and appropriate action after it learned about the April 25, 2016 letter, thereby fostering a hostile work environment from April 25, 2016 through the day the Portage location closed.

### SECTION II
### CHARGING PARTY RELIEF[1]

1.  Back Pay - Respondent agrees to pay the Charging Party $126,316.10 in back pay, less legal deductions.

2.  Pecuniary Compensatory Damages - Respondent agrees to pay the Charging Party $38,315 in pecuniary compensatory damages, less legal deductions.

3.  Non-Pecuniary Compensatory and Punitive Damages - Respondent agrees to pay the Charging Party $300,000 in non-pecuniary compensatory and punitive damages, less legal deductions.

9.      Thereafter the E.E.O.C. issued a "Right-to-Sue" letter to Dr. Campbell-Jackson giving rise to this lawsuit.

## JURISDICTION AND VENUE

10.     On May 8, 2016, Dr. Campbell-Jackson filed a complaint with the E.E.O.C. and the Michigan Department of Civil Rights.

11.     A Right-to-Sue letter was issued to Dr. Campbell-Jackson by the United States Department of Justice, Civil Rights Division, on September 16, 2021.

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this is an action arising under 42 U.S.C. § 2000e.

13.     The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the claims providing the basis for federal subject matter jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

14.   This Court has personal jurisdiction over the Defendant because the conduct which gives rise to this lawsuit occurred within this jurisdiction.

15.     Venue is proper in this jurisdiction under 42 U.S.C. § 2000e-5(f)(3) because State Farm's unlawful employment practice was committed in this judicial district, the employment records relevant to the unlawful practices are maintained and administered in this judicial district, and Dr. Campbell-Jackson's employment within this judicial district would have continued but for State Farm's unlawful employment practices.

## PARTIES

16.    Dr. Campbell-Jackson is an African American female, and a former employee of State Farm.

17.    At all times relevant, Dr. Campbell-Jackson was employed by State Farm out of the Portage, Michigan office.

18.    Dr. Campbell-Jackson earned her Bachelor's Degree from Drake University and went on to earn her M.B.A from Illinois State University and Ph.D. from the University of Phoenix.

19.    Dr. Campbell-Jackson was 100% MCAR compliant and went on to earn a plethora of insurance designations, including: Associate in Claims (AIC), Associate In Management (AIM), Associate in Insurance Service (AIS), Associate in General Insurance (INS), Claims and Legal Liability Practices (CLLP), and the most respected designation in the industry, the Chartered Property Casualty Underwriter (CPCU).

20.    Dr. Campbell-Jackson is the 1st Vice President of the Bloomington-Normal Illinois NAACP Branch and she is an elected NAACP State Officer.

21.    State Farm is a large group of insurance companies throughout the United States, including in Michigan, with its corporate headquarters in Bloomington, Illinois.

22.    State Farm is an employer as defined by Title VII of the Civil Rights Act of 1964 and was, at all times relevant to this complaint, Dr. Carla Jackson's employer.

## BACKGROUND

### I.    Dr. Campbell-Jackson's Career at State Farm

23.    Dr. Campbell-Jackson was employed at State Farm for 28 years.

24.    Dr. Campbell-Jackson's illustrious career began as an intern with State Farm.  Dr. Campbell-Jackson worked diligently to advance her career obtaining numerous promotions, including to the following titles: Claims Service Representative, Human Resources Representative, Claims Supervisor, Lead for State Farm Claims Customer Service Initiative, Claims Section Manager, Lead for State Farm's Change Adoption Support Team, and the Claim Section Manager for the Special Investigative Unit.

25.    During her career with State Farm, Dr. Campbell-Jackson regularly earned "best in class" job performance reviews and ratings.

26.    Dr. Campbell-Jackson received hundreds of complimentary work-related emails from customers, front line employees, and executives.

27.    Dr. Campbell-Jackson received exceptional performance ratings from State Farm, including ratings of "outstanding" and "superior."

28.    Dr. Campbell-Jackson received exceptionally high Employee Opinion Survey results. Specifically, other State Farm employees rated Dr. Campbell-Jackson with scores ranging from 90% to 100% in all categories – significantly higher scores than the company average.

29.    Dr. Campbell-Jackson's talent profile identified her ratings as "exceptional" and "highly proficient."

30.    When State Farm changed its rating system to a one through three system (with three being the highest score), Dr. Campbell-Jackson routinely achieved level three scores, meaning she "consistently exceeded expectations" and "consistently demonstrated competencies at a high level or viewed as a role model."

31.    In 2005, Dr. Campbell-Jackson earned the "Spirit of State Farm" award – the highest award that can be bestowed upon a State Farm employee, and one that is reserved for employees who perform at the highest caliber.

32.    In 2008, Dr. Campbell-Jackson received the CCSI Super-Star Performance award for her exceptional performance as the Lead for State Farm's Claims Customer Service Initiative.

33.    Dr. Campbell-Jackson was featured in the State Farm magazine *Claims Quarterly* three separate times.

34.    Dr. Campbell-Jackson was showcased in internal State Farm training videos.

35.    In 2014 and 2015, Dr. Campbell-Jackson was asked to spearhead the creation and development of the Michigan Jurisdictional Template which resulted in consultants labeling her work as being the most complete jurisdictional template that had ever been submitted company-wide at State Farm. To this day, new employees are trained via the Michigan Jurisdictional Template created by Dr. Campbell-Jackson.

36.    Despite enduring decades of racism and discrimination, Dr. Campbell-Jackson worked diligently as a model State Farm employee.

## II.    State Farm's Culture of Racism and Discrimination

37.    Dr. Campbell-Jackson faced a harsh culture of racism and discrimination throughout her career at State Farm.

38.    For instance, Dr. Campbell-Jackson earned a CPCU designation (the most respected designation in the industry) which her white managers at State Farm joked stood for "Colored People Can't Understand."

39.    Dr. Campbell-Jackson often reported instances of racism and discrimination to upper leadership, Human Resources and via the Code of Conduct line.

40.    Her reports, however, were blatantly dismissed and met with harsh pushback.

41.    Prior to and around September 2014, Dr. Campbell-Jackson complained to State Farm's Human Resources Department and her manager that State Farm was allowing racism to persist throughout its culture.

42.    Around that same time, Dr. Campbell-Jackson was selected and assigned to manage State Farm's Special Investigative Unit ("SIU").

43.    The stated purpose of this unit was to investigate potential insurance fraud.

44.    In practice, State Farm trained and conditioned SIU employees to stereotype customers based on race, neighborhood, income, and agent affiliation to identify customers who were "likely to engage in fraud."

45.    As the manager of SIU in late 2015 and early 2016, Dr. Campbell-Jackson discovered a disturbing trend of minority claims being systemically and illegally denied by State Farm.

46.    Dr. Campbell-Jackson vocalized her related concerns to State Farm through multiple channels.

47.    Dr. Campbell-Jackson's concerns were met with harsh rebuke and admonishment.

48.    In addition to external racist and discriminatory practices, State Farm's internal culture of racism included the following:

a.    A State Farm employee wove a stick man with a noose around his neck to signify an African American being hung;

b.    A State Farm manager openly displayed a picture of a slave plantation in his office;

c.    A racist African American meme was distributed throughout the entire State Farm organization:



"State Farm Customer Be Like……"



10

d. The hateful words, "No Muslims, Blacks and Spics" were written on bathroom stalls inside State Farm;

e. A letter was distributed within State Farm suggesting that "Blacks and Hispanish" are "welfare" recipients, "dumb," and "ugly" and advocating for "no minorities and Muslims." (Ex. 1);

f. Pictures of the minority State Farm managers were "X"d out on a wall at State Farm while white manager's pictures were untouched;

g. A Caucasian employee told an African American employee "Well, you know black people sound different than white people … I think it's your culture … white people talk proper and black people talk different … you know it's hard to understand black people but I must say you are patient;"

h. State Farm leaders called an African American State Farm Manager, who was assumed to be multi-racial, a "mutt";

i. Dr. Campbell-Jackson was told by State Farm leaders that she needed to "talk more like someone from the inner-city of St. Louis;"

j. State Farm employees attempted to force Dr. Campbell-Jackson to kiss a live pig as a form of racist humiliation;

k. State Farm employees called an African American woman "a bitch" while in the workplace;

l. For years, Dr. Campbell-Jackson witnessed African Americans, and other minorities, systemically receive the lowest performance ratings and salary increases, including in February 2015 when Dr. Campbell-Jackson expressed concern that a Caucasian candidate was chosen for a promotion over an objectively and clearly more qualified African American candidate. (per State Farm's own written and documented grading system);

m. Dr. Campbell-Jackson witnessed many State Farm employees make other racist comments, including the "N" word, the phrase, "Dumb Ass Ni**ers" (DANS), and stating that they wished President Obama was assassinated;

n. In April 2016, Dr. Campbell-Jackson and other minority employees received a racist letter at their home and work addresses with statements including,

    i.   "Hispanish are lazy and cannot speak English well;"

    ii.   "Blacks are uneducated (maybe one or two exceptions);"

    iii.   "Muslims are at the bottom of the barrel with Hispanish;"

    iv.   "They [State Farm executives] really do not want minorities at State Farm, but the executives have to keep it inside;"

    v.   "Buffoon picture of the black lady" [see ¶ 48(c) above] … "Man, we laughed SO hard," … "some of us use it as our screen saver;"

    vi.   "Tiana (the crackhead and unmarried mother);"

    vii.   "The black churches are scams;" (Ex. 2).

## III.   Dr. Campbell-Jackson is Retaliated against for Complaining about State Farm's Culture of Racism and Discrimination

49.    As set forth above, Dr. Campbell-Jackson expressed disappointment and concern regarding the racist and discriminatory conduct she witnessed at State Farm over the years.

50.    In response to Dr. Campbell-Jackson's concerns, State Farm's Vice-President of Human Resources Ricardo Garcia had several conversations with Dr. Campbell-Jackson and even called Dr. Campbell-Jackson and specifically requested that she email him evidence of discriminatory practices – i.e. the practices she observed as an SIU manager.

51.    Dr. Jackson complied with the request.

52.    On May 5, 2016, shortly after Dr. Carla Jackson expressed her concern about the April 2016 racist letter (i.e. Ex. 2), Vice-President of Human Resources Ricardo Garcia sent Dr. Campbell-Jackson an email, asking to meet with her the next

week.  Dr. Campbell-Jackson was under the impression that Mr. Garcia would seek her advice (as he had done before) regarding race relations.

53.    On May 9, 2016, Vice-President of Human Resources Ricardo Garcia and Claims VPO Kelly Bever met with Dr. Campbell-Jackson at State Farm's office in Portage Michigan.

54.    During the October 9, 2016 meeting, Dr. Campbell-Jackson was terminated for the stated reason of transmitting "Sensitive Personal Information" ("SPI") through her email to State Farm's Vice-President of Human Resources.

55.    State Farm's stated reason was pre-textual.

56.    For context, many other State Farm employees inadvertently transmitted SPI through emails, and at most, said employees were reminded by manager to remain mindful and to avoid sending SPI. In Dr. Campbell-Jackson's case, it was decidedly not a terminable offense, and despite her decades of experience at State Farm, Dr. Campbell-Jackson is unaware of any other terminations due to the transmission of SPI.

57.    Moreover, State Farm generally operated under a "progressive discipline policy," meaning that absent egregious behavior (such as stealing or embezzlement), termination would only be utilized if an employee was the recipient of multiple prior disciplinary documentation.

58.    Dr. Campbell-Jackson never received any prior disciplinary documentation.

59.    Given Dr. Campbell-Jackson's distinguished career with State Farm, there existed no justification for her termination other than retaliation in response to Dr. Campbell-Jackson's complaints about State Farm's racist culture, hostile work environment, and the discriminatory treatment of minority customers at State Farm.

60.    During that same May 9, 2016 meeting in Portage, Michigan in which State Farm terminated Dr. Campbell-Jackson, and in acknowledgment of its illegal act of retaliation, State Farm attempted to offer Dr. Campbell-Jackson $175,000.00 of hush money.

61.    The proposed hush money was more than Dr. Campbell-Jackson earned on an annual basis and not commensurate with typical severance payments made by State Farm to at-will employees who were allegedly terminated for cause.

62.    The proposal was conveyed to Dr. Campbell-Jackson by State Farm's Vice President of Human Resources who offered the $175,000.00 payout in exchange for Dr. Campbell-Jackson's agreement to keep quiet about State Farm's racist culture.

63.    Dr. Campbell-Jackson refused to accept the hush money and refused to sign the proposed "gag" agreement.

64.    Notably, State Farm's Vice President of Human Resources anxiously called Dr. Campbell-Jackson and left her multiple voice mail messages in a panic that she would not accept the hush money – which she did not.

**IV.    The E.E.O.C. Investigated and Determined that State Farm did – in fact – Engage in Discriminatory, Racist, and Retaliatory Misconduct.**

65.    After years of investigation, in February 2021, the EEOC reached a "Determination" that State Farm violated Title VII by harassing Dr. Campbell-Jackson due to her race, and then illegally terminated her in retaliation for complaining about the harassment and the disparate treatment of African Americans and minority employees of State Farm.

66.    The EEOC recommended that State Farm pay Dr. Campbell-Jackson $464,631.10 in compensatory and punitive damages.

67.    Given the horrific culture of racism and discrimination within State Farm, the E.E.O.C. also recommended:

    a.    in-person diversity and inclusion training for top level executives at State Farm;

    b.    redistribution of the anti-harassment policy to all employees; and

    c.    providing detailed reports to the E.E.O.C., listing all harassment complaints made by employees.

**COUNT I**
**Title VII, 42 U.S.C. §2000(e), et seq.**
**Discrimination, Harassment, and Hostile Work Environment Claim**

68.    Each of the foregoing paragraphs are incorporated herein as if fully restated.

69.    As an African American, Dr. Campbell-Jackson is a member of a protected class.

70.    As described above, State Farm's conduct towards Dr. Campbell-Jackson was discriminatory and occurred because of and based upon Dr. Campbell-Jackson's race.

71.    State Farm's conduct occurred over several years, constituting a continuing course of discrimination towards Plaintiff.

72.    State Farm committed an unlawful employment practice by treating Plaintiff differently because of her race, causing a change in the condition of her employment and subjecting her to a hostile work environment.

73.    Plaintiff was subjected to a racially discriminatory environment that was both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that Plaintiff in fact did perceive to be so.

74.    State Farm's conduct had the purpose or effect of unreasonably interfering with Plaintiff's work performance.

75.    State Farm's conduct had the purpose or effect of creating an intimidating, hostile and offensive work environment.

76.    State Farm's actions permeated the workplace with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive and regular to alter the conditions of Plaintiff's employment and create an abusive working environment.

77.    State Farm's racist and discriminatory conduct created a hostile work environment for Dr. Campbell-Jackson.

78.     State Farm's racist and discriminatory conduct included terminating Dr. Campbell-Jackson for racially discriminatory reasons.

79.     But for State Farm's conduct of terminating Dr. Campbell-Jackson for racially discriminatory reasons, Dr. Campbell-Jackson's employment for State Farm in State Farm's Portage, Michigan office would have continued.

80.     State Farm willfully and intentionally subjected Dr. Campbell-Jackson to racial discrimination.

81.     State Farm knew its actions violated Title VII or it was recklessly indifferent in that regard.

82.     Defendant has therefore denied Plaintiff her rights under the Civil Rights Act of 1964 and she has suffered damages as a direct result of her rights being violated.

83.     As a direct and proximate result of the foregoing, Dr. Campbell-Jackson has suffered, and will continue to suffer, damages including, but not limited to, loss of front and back wages, earnings, benefits, insurance premiums, emotional distress, and other damages to be determined at trial. Dr. Campbell-Jackson claims compensatory and punitive damages for these losses and injuries under § 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

## COUNT II
### Title VII, 42 U.S.C. §2000(e)-(3)
### Retaliation

84.     Each of the foregoing paragraphs are incorporated herein as if fully restated.

85.    Dr. Campbell-Jackson engaged in a statutorily protected activity when she reported racism and discriminatory conduct to State Farm.

86.    State Farm and its agents intentionally retaliated against Dr. Campbell-Jackson in response to her reporting.

87.    State Farm took a materially adverse action against Dr. Campbell-Jackson when State Farm terminated Dr. Campbell-Jackson.

88.    These adverse actions were directly related and causally connected to Dr. Campbell-Jackson's reporting of State Farm's racism and discriminatory conduct.

89.    But for State Farm's conduct of terminating Dr. Campbell-Jackson for racially discriminatory reasons, Dr. Campbell-Jackson's employment for State Farm in State Farm's Portage, Michigan office would have continued.

90.    These adverse actions were in direct violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e-3.

91.    By reason of this retaliation by State Farm, Dr. Campbell-Jackson suffered a loss of earnings and benefits, in addition to suffering great pain, distress, anxiety, and mental anguish, all to her damage.

92.    Further, said action on the part of State Farm was done with malice and reckless disregard for Dr. Campbell-Jackson's protected rights.

93.    As a direct and proximate result of the foregoing, Dr. Campbell-Jackson has suffered, and will continue to suffer, damages including, but not limited to, loss of front and back wages, earnings, benefits, insurance premiums, emotional distress, health care costs and expenses, and other damages to be determined at trial. Dr.

Campbell-Jackson claims compensatory and punitive damages for these losses and injuries under § 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

**COUNT III**
**Violation of the Michigan Elliot-Larsen Civil Rights Act 453 of 1976,**
**Mich. Comp. Laws Ann. § 37.2202**
**Discrimination**

94.     Each of the foregoing paragraphs are incorporated herein as if fully restated.

95.     As an African American, Dr. Campbell-Jackson is a member of a protected class.

96.     Dr. Campbell-Jackson was qualified for her various positions at State Farm.

97.     Dr. Campbell-Jackson suffered an adverse employment action, namely being terminated, as a result of her race.

98.     There was no legitimate nondiscriminatory reason for her termination and any explanation offered by State Farm was pretextual for their intentional discrimination.

99.     As a result of State Farm's discrimination, Dr. Campbell-Jackson suffered humiliation, embarrassment, outrage and disappointment, loss of wages, loss of pension rights and employee benefits, loss of seniority and loss of employment.

100.    Dr.  Campbell-Jackson's  damages  flowed  from  State  Farm's discriminatory conduct.

101.    As a direct and proximate result of State Farm's actions, Dr. Campbell-Jackson has suffered, and will continue to suffer, damages including, but not limited

to, loss of front and back wages, earnings, benefits, insurance premiums, emotional distress, and other damages to be determined at trial. Plaintiff claims special damages, economic damages, and attorneys' fees and costs as permitted by law.

## COUNT IV
### Violation of the Michigan Elliot-Larsen Civil Rights Act 453 of 1976, Mich. Comp. Laws Ann. § 37.2701 Retaliation

102.    Each of the foregoing paragraphs are incorporated herein as if fully restated.

103.    Dr. Campbell-Jackson's acts of reporting State Farm's racist and discriminatory conduct were in opposition to violations of the Elliot-Larsen Civil Rights Act.

104.    Dr. Campbell-Jackson's acts of reporting State Farm's racist and discriminatory conduct constituted protected activity.

105.    State Farm was aware that Dr. Campbell engaged in the protected activity of reporting State Farm's racist and discriminatory conduct.

106.    State Farm took a materially adverse action against Dr. Campbell-Jackson when State Farm terminated Dr. Campbell-Jackson.

107.    These adverse actions were directly related and causally connected to Dr. Campbell-Jackson's reporting of the racism and discriminatory conduct.

108.    As a direct and proximate result of State Farm's actions, Dr. Campbell-Jackson has suffered, and will continue to suffer, damages including, but not limited to, loss of front and back wages, earnings, benefits, insurance premiums, emotional

distress, and other damages to be determined at trial. Plaintiff claims special damages, economic damages, and attorneys' fees and costs as permitted by law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Dr. Carla Campbell-Jackson, by and through her attorneys, Hart McLaughlin & Eldridge, LLC, and Ben Crump Law, respectfully requests that the Court enter an Order granting the following relief against the Defendants, Superintendent Johnson and the City of Chicago:

A.     Awarding Plaintiff actual damages;

B.     Awarding Plaintiff lost wages;

C.     Awarding Plaintiff damages for her psychological injuries and emotional distress;

D.     Awarding Plaintiff punitive damages;

E.     Awarding Plaintiff her reasonable attorneys' fees and litigation costs; and

F.     Awarding such other and further relief as the Court deems reasonable and just.

## **JURY DEMAND**

Plaintiff demands a trial by jury in this action on each and every one of her claims.

Dated: December 9, 2021

Respectfully Submitted,


*/s/* Robert J. McLaughlin, Esq.

Robert J. McLaughlin, Esq.
Steven A. Hart, Esq.
Carter D. Grant, Esq.
Y'Noka Bass, Esq.
**Hart McLaughlin & Eldridge, LLC**
22 West Washington, Suite 1600
Chicago, Illinois 60602
Tel:  (312) 955-0545
Fax: (312) 971-9243
FIRM ID: 59648
rmclaughlin@hmelegal.com
shart@hmelegal.com
cgrant@hmelegal.com
ybass@hmelegal.com


Benjamin Crump
**BEN CRUMP LAW**
122 S. Calhoun Street
Tallahassee, Florida 32301
P. (800) 713-1222
ben@bencrump.com