UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARLA CAMPBELL-JACKSON,

     Plaintiff,

                               Case No. 1:21-cv-1044

v.

                               Hon. Hala Y. Jarbou

STATE FARM INSURANCE,

     Defendant.

_____/

## OPINION

Plaintiff Dr. Carla Campbell-Jackson worked for Defendant State Farm Insurance until May 9, 2016, when it terminated her.  Plaintiff is an African American woman.  In this action, she contends that she faced a racially hostile work environment at State Farm, and that it retaliated against her for complaining about racism and harassment at State Farm, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq.  Before the Court is State Farm's motion for summary judgment (ECF No. 104).  For the reasons herein, the Court will grant the motion.

## I. BACKGROUND

### A. Plaintiff's Career at State Farm

Plaintiff worked at State Farm for twenty-eight years.  She started as an intern and steadily worked her way up the ladder.  Over the years, she held the following job titles: Claims Service Representative, Human Resources Representative, Claims Supervisor, Claims Team Manager, Claims Section Manager, and, finally, Claims Section Manager for the Special Investigative Unit ("SIU") at State Farm.  (Garcia Dep. 34, ECF No. 111-3; Work History, ECF No. 111-5.)  During her employment with Defendant, she obtained numerous insurance-related certifications and she

consistently received positive evaluations for her work performance.  She never received any formal discipline until her termination.

Plaintiff began working for the SIU in 2014.  The SIU was located at Defendant's offices in Kalamazoo, Michigan.  As a member of the SIU, Plaintiff was responsible for investigating insurance claims that were potentially fraudulent.

### B. Plaintiff Complains to State Farm about Discrimination, Harassment, and Retaliation (2009-2010, 2015-2016)

As early as 2009 or 2010, Plaintiff told Defendant's human resources staff that her supervisor, Claims Manager Celeste Dodson, had subjected Plaintiff to "hostile, harassing, and retaliatory behavior."  (*See* Pl.'s Answers to Interrogs., ECF No. 111-31, PageID.1293.)  Plaintiff asked to "no longer report" to Dodson.  (*Id.*)

Later, while working in the SIU, Plaintiff made frequent complaints to Dodson and to human resources staff about "harassing," "retaliatory," or racially "discriminatory" behavior by State Farm employees.  (*See id.*, PageID.1293-1298.)  For instance, in January 2015, she told Dodson that she had received a letter "outlining concerns relating to racism and discrimination against African American and other minority group members."  (*Id.*, PageID.1294.)  She offered to participate in any investigation conducted by Defendant.

On February 26, 2015, Plaintiff called a State Farm hotline and complained that a Section Manager had directed "threatening, intimidating, and bullying behavior" at her.  (*Id.*)  A week later, Plaintiff told Dodson and representatives from human resources about the "hostile communications" she had received from the same Section Manager.  (*Id.*)

On March 27, 2015, Plaintiff reported instances of "racist and discriminatory behavior" by State Farm employees occurring over the course of the previous seven years, including the following: "African American employees not receiving promotional opportunities"; "African

American employees were consistently provided with the lowest annual performance salary percentage"; "African American employees were not allowed to participate on special projects"; and "African American employees were often denied the opportunity to be hired as Claims Representatives [because the interviewers] would say the African American employees were 'too aggressive' throughout the interview"; an incident in 2009 or 2010 when "all the African American managers' pictures were crossed out and the White managers' pictures were left untouched"; an incident in 2009 or 2010 when a Team Manager held a "secret contest" to have employees vote for the Team Manager "that they wanted to kiss a real live pig," and the two African American managers were chosen.  (*Id.*, PageID.1294-1295.)

On April 1, 2015, as part of an investigation by human resources staff focused on "racism and discrimination," Plaintiff reported that "African American employees were labeled as 'non-team players' if they did not agree with decisions made at happy hours or after hour dinners" and that "[w]hite Section Managers were opposed to hiring a [b]lack Team Manager who was more tenured and better suited for a position than a white Team Manager[.]"  (*Id.*, PageID.1296.)  A week later, she reported "discriminatory treatment of minority employees in the hiring and promotion process," as well as "discriminatory treatment of minority customers in claim handling . . . by State Farm employees."  (*Id.*)

On June 23, 2015, Plaintiff raised concerns to Dodson and human resources staff about "verbal harassment" that she had received from a Section Manager.  Six days later, Plaintiff participated in an investigation in which she reported the harassment she received from that Section Manager.  (*Id.*)

On December 10, 2015, Plaintiff made several reports, including one to Dodson, about "an incident in which a bathroom door located on the second floor of a State Farm building was

defaced."  (*Id.*, PageID.1297.)  On the door, someone had written "NO MUSLIMS, SPICS OR BLACKS!"  (*Id.*)  She also shared concerns with Dodson about "the hostile work environment, discrimination, and racism this incident created."  (*Id.*)

The day after Plaintiff reported the bathroom incident to Defendant's managers, one of those managers, Cathy Fulk, emailed two other State Farm employees about Plaintiff's report. According to Fulk, she had received a phone call from Plaintiff, who was "extremely upset" that Fulk did not "call her right away" about the bathroom incident.  (12/11/2015 Fulk-McCabe Emails, ECF No. 111-33, PageID.1303.)  Fulk said she told Plaintiff that Fulk was following her own protocol and Plaintiff responded that she "doesn't care what [Fulk's] protocol is."  (*Id.*)  Plaintiff "demanded" that she be contacted if that sort of incident occurred again in the future.  (*Id.*)  Brian McCabe, another State Farm employee, replied to Fulk, stating, "[Fulk] has this [bathroom incident] well in hand and did everything she . . . needed to do.  I understand that this particular Claim Section Manager (Carla Campbell-Jackson) has been a continual problem at the facility." (*Id.*)

In "January 7, 2016 through April 12, 2016," Plaintiff told Garcia, Vice President of Operations for Human Resources, about "hostile, harassing, and retaliatory behavior" by her supervisor, Dodson.  (Pl.'s Answers to Interrogs., PageID.1297.)  Plaintiff again asked that she no longer report to Dodson.  (*Id.*)

On January 25, 2016, Plaintiff told Kelly Bever, the Vice President of Operations, that she "experiences racism on a daily basis[.]"  (*Id.*)  Plaintiff also "shared her disap[p]roval" regarding a "lack of response" to the message written on the bathroom door in December 2015.  (*Id.*)

Through her work in the SIU, Plaintiff became concerned that the majority of insurance claims being denied by Defendant were from "minority group members, specifically African-

Americans, Hispanics, and Indians[.]" (Campbell-Jackson Dep. 57, ECF No. 111-1.)[1]  In February 2016, she reported these concerns to SIU Claim Consultant Juliann Klokkenga.  (*See* Campbell-Jackson Emails to Klokkenga, ECF Nos. 111-34, 111-35.)  In response, Klokkenga acknowledged Plaintiff's "general concerns," but noted that Plaintiff "did not have specific issues" with the claims process and "[had] not observed any specific claims not handled on [their] merits."  (Klokkenga Email to Campbell-Jackson, ECF No. 111-36.)  Klokkenga encouraged Plaintiff to share any additional information.  (*Id.*)

On March 23, 2016, someone sent an email containing a "racist meme" to more than 50,000 State Farm employees.  Plaintiff reported this email to a State Farm human resources representative, Joni Davis.  Davis responded that the company was already aware of concerns about the email and was investigating who may have sent it.  (3/28/2016 Davis Email, ECF No. 111-37.)

On April 25 and 26, 2016, Plaintiff told Dodson and Garcia about a racist letter that she and other State Farm employees had received (the letter is discussed in more detail below).  (Pl.'s Answers to Interrogs., PageID.1297-1298.)

On May 3, 2016, Plaintiff told Dodson and Garcia that she "had been subjected to hostile, intimidating, and retaliatory behaviors throughout the recent period of her career."  (*Id.*, PageID.1298.)  Six days later, when Garcia and Bever met with Plaintiff and terminated her, she told them that she had concerns about "racism, discrimination, retaliation, and [the] hostile work environment she had been subjected to."  (*Id.*)

---

[1] Excerpts of Plaintiff's deposition are also available at ECF No. 104-2.

### C. Plaintiff Receives an Average Performance Review

As indicated above, Plaintiff generally received positive performance reviews throughout her career.  In September 2015, however, Dodson gave Plaintiff a performance review with an "average" score.  (Campbell-Jackson Dep. 122.)  The review graded Plaintiff at 2 out of 3 on "results" and 1 out of 3 on "competencies."  (Review, ECF No. 111-38, PageID.1326 (1 is the lowest score and 3 is the highest).)  The review described positive improvement in Plaintiff's results but expressed concerns about "her lack of business acumen; ability to problem solve; collaborate effectively with her peers; lack of self awareness; and inability to effectively communicate the vision and business goals of the Enterprise to her team managers[.]"  (*Id.*, PageID.1325.)  Plaintiff believes the review was a "retaliatory" response to her "concerns about racism and discrimination."  (Campbell-Jackson Dep. 122.)

### D. Plaintiff Sends Confidential Information to her Personal Email Address

Sometime after Dodson's performance review, Plaintiff expressed concerns about it to Garcia.  She told him that Dodson had not rated her fairly.  (*Id.*)  He told her to send him examples of why she thought her performance did not match Dodson's review.  (Garcia Dep. 110, ECF No. 111-4.)[2]  On January 20, 2016, Plaintiff sent him an email with 50 electronic documents attached.  Those documents included compliments from co-workers, business reports, and performance memos.  One of the documents was a claim file that contained the name and social security number of a physician.  (*Id.* at 125.)  Plaintiff sent a copy of this email, along with the attached documents, to her personal email address.

---

[2] Excerpts of Garcia's deposition are also available at ECF No. 104.

### E. State Farm Investigates Plaintiff's Conduct

Plaintiff's email to her personal address triggered an automated "Data Loss Prevention" warning for Dodson, Plaintiff's supervisor. (DLP Warning, ECF No. 111-40.) The warning stated that Plaintiff had transferred "Sensitive Personal Information (SPI)" outside of State Farm's network. (*Id.*) Dodson immediately reported the warning to her supervisor. After learning about the incident, Garcia told Human Resources Director Leslie Anderson that "there were several issues to work through," that the team should "stay in a holding pattern," and that they "should assume at this point, everything she does is calculated." (1/20/2016 Garcia Email, ECF No. 111-42.)

Defendant assigned Kelly Park, an employee relations investigator, to investigate the data loss prevention ("DLP") incident. (1/22/2016 Park Email, ECF No. 106-1, PageID.771.) And because Plaintiff transferred SPI outside of State Farm's network, State Farm's policies required it to notify the individual whose SPI was involved. In February, Defendant sent that individual a letter notifying them of a "data breach" involving their personal information and offering them a 12-month subscription to a credit monitoring service. (*See* 2/16/2016 Notice of Data Breach, ECF No. 106-1, PageID.800.)

By March 3, 2016, Park completed an initial review of the DLP incident and confirmed that Plaintiff had sent one item of SPI (the social security number) to her personal email address, as well as five documents that were "identified as Internal Use Only or as Confidential." (3/3/2016 Park Email, ECF No. 111-47, PageID.1354.) Park also reviewed over 4,000 other emails between Plaintiff's work email address and external email addresses from December 1, 2014, to January 2016. (*Id.*, PageID.1353, 1355.) Park concluded that "94 percent" of those emails "appeared to be personal correspondence" and that "[a] very small portion of business related emails were either legitimate correspondence with external parties or Outlook automatic replies." (*Id.*, PageID.1353.)

7

Park also found a total of "[e]leven emails [that] were identified as Internal Use Only or Confidential in nature." (*Id.*, PageID.1356.)  Park sent her findings to Garcia. (*See id.*, PageID.1353.)[3]

Plaintiff's transmission of SPI and confidential information outside Defendant's network violated its code of conduct. (*See* State Farm Code of Conduct, ECF No. 105-1, PageID.710 (prohibiting unauthorized disclosure and personal use of State Farm information).)  In addition, Plaintiff's use of her business email for personal purposes potentially violated Defendant's rules regarding employee use of its resources. (*See id.* (requiring employees to use "State Farm electronic information resources . . . primarily for Company purposes, and not for personal benefit or that of others. . . . Personal use must be reasonable and kept to a minimum.").)

### F. Plaintiff and Other State Farm Employees Receive a Racist Letter

On April 25, 2016, the mailroom at Defendant's Kalamazoo office received several copies of a letter (the "April 25 Letter") from an unknown individual.  The sender had mailed the letter in envelopes addressed to Plaintiff and approximately ten other employees at the office.  The letter, which was directed to the President of State Farm and to "HISPANISH, MUSLIMS, BLACKS AND MINORITIES IN KALAMAZOO," was filled with racist and offensive statements. (*See* April 25 Letter, ECF No. 111-48, PageID.1358.)  For example, the letter stated:

> . . . Hispanish are lazy and cannot speak English well.  Blacks are uneducated (maybe one or two exceptions) and Muslims are at the bottom of the barrel with the Hispanish. . . . When Trump came to Bloomington, . . . we saw a LOT of State Farm employees and a LOT of State Farm executives.  They really do not want minorities at State Farm . . . .

---

[3] Park prepared another report after Plaintiff's termination (*see* 5/26/2016 Executive Summary, ECF No. 111-61), but the Court will not consider the evidence of Plaintiff's conduct in that report because there is no indication that anyone responsible for terminating Plaintiff was aware of the additional information in that report when they made their decision.

. . . The black churches are scams . . . .  The silent majority members were not happy that they brought posters and flyers into the building and placed them all around our workplace begging for money for the black lady only.

. . . The silent majority has been waiting for ten years and finally, the tables have turned on the minorities and the silent minority can speak out again.

(*Id.*)  The contents of the letter suggested that the sender was a State Farm employee.  Among other things, the letter referred to the email with the racist meme that went to State Farm employees in March 2016.

After Plaintiff received her copy of the letter, she learned that there were other copies still in the mailroom that had not yet been delivered to their intended recipients.  (Campbell-Jackson Dep. 69.)  She told her secretary to go to the mailroom and retrieve them because she did not want the other employees to see them.  (*Id.* at 70.)  Her secretary found ten or twelve copies of the letter and brought them to Plaintiff.  (*Id.* at 100.)  Plaintiff contacted some of the employees identified on the envelopes to tell them about the letter.  (*Id.*)  She also notified David Lipowski, the local administrative services manager.  He spoke with Plaintiff and then reported the matter to Nikio Castro, an Area Manager.  (*See* 4/25/2016 Lipowski Email, ECF No. 106-1, PageID.749.)

Shortly thereafter, Plaintiff emailed Dodson and Garcia to inform them of the letters.  (4/25/2016 Campbell-Jackson Emails, ECF No. 106-1, PageID.734, 759.)  They later spoke with her about them.  (Campbell Jackson Dep. 73.)  When Plaintiff told Garcia that she had been trying to collect all the letters, he told her, "[T]hat is not your job, those letters were addressed to State Farm[.] . . . I don't need you around there sharing the letters or opposing the letters to people."  (*Id.* at 77-78.)  Similarly, Dodson admonished her to "stay in [her] lane" and to "let HR handle [the] matter."  (*Id.* at 78.)  Plaintiff thought that Dodson's response was "demeaning" because Plaintiff had "more education" than Dodson, than "all of [Plaintiff's] peers," and "probably [more than] most people in HR[.]"  (*Id.* at 83.)

**G. State Farm's Response to the April 25 Letter**

When examining the envelopes, Lipowski noted that they did not have a return address. (4/25/2016 Lipowski Emails, ECF No. 106-1, PageID.747.)  And the sender did not write the recipients' addresses in his own hand.  Instead, the sender printed the addresses on a separate page, cut out the addresses, and then affixed them to the envelopes.  (*Id.*)  Lipowski sent these details to Castro, Supervisor Fulk, Supervisor Georgeanna McDorman, and Director Terri Layne.  (*Id.*, PageID.745, 747.)  Lipowski then completed a "threat assessment" identifying the intended recipients of the letter and noting that the perpetrator was unknown. (*Id.*, PageID.737-746.)  Castro had Lipowski send the unopened envelopes and all hard copies of the letter to Human Resources Director Anderson, at Defendant's headquarters.  (4/27/2016 Mem. to File, ECF No. 111-49, PageID.1361.)[4]  Lipowski told the mailroom employees to look out for similar letters and to send them to Lipowski.  (*Id.*)

Garcia coordinated the response to the April 25 Letter.  (Garcia Dep. 132.)  He was aware that administrative services had collected the letters from the mailroom.  (*Id.*)  He set up a conference call with the "leaders in the Kalamazoo office," including "administrative services," the "security team," and "human resources[.]"  (*Id.*)  Defendant also "increased security" at the front offices in Kalamazoo and the security team contacted the local police department.  (*Id.*)

On April 26, the day after the letter arrived, Dodson contacted Plaintiff by email, thanked her for reporting the letter, and informed her that executive teams in human resources and administrative services were handling the matter.  Dodson told Plaintiff she could "reach out to" Dodson in order to "continue the dialog however [Plaintiff] feel[s] most appropriate," and that

---

[4] Carla Orwin, an "ER Manager," prepared a memorandum on April 27, 2016, recounting her discussion with Lipowski about his response to the April 25 Letter.  (ECF No. 111-49.)  Although the memo contains statements that could be hearsay, the Court will consider it because Plaintiff relies on it to support her response and Defendant does not object to its use.

Plaintiff should use "resources available" to her, including "HR, Lifeworks and EHS." (4/26/2016 Dodson Email, ECF No. 106-1, PageID.736.)

On April 27, Director Anderson emailed a group of managers to inform them about the April 25 Letter, to provide them with "message points" to discuss with their team members, and to assure them that Defendant takes "anything impacting our work environment . . . very seriously." (4/27/2016 Anderson Email, ECF No. 106-1, PageID.754.)

On May 2, Director Anderson sent a memorandum to Dodson and other supervisors in the Kalamazoo office, directing them to discuss "huddle message points" with their direct reports in response to the April 25 Letter. (5/2/2016 Email, ECF No. 106-1, PageID.756.) Anderson wanted "all of their employees" to receive these messages verbally by the end of the following day. (*Id.*) The messages included the following: Defendant was "committed to a workplace environment where everyone is treated with respect and dignity"; a "small number" of employees had received a "derogatory, anonymous" letter that was "intolerable" to Defendant; extra security had been added to the Kalamazoo office campus; Defendant had launched an investigation into the incident; if any employees were aware of who was involved, they had an obligation to report it; and for anyone involved in or responsible for the letter, the consequences would be "very serious." (*Id.*)

On May 6, Defendant sent another memorandum to Dodson and other supervisors at the Kalamazoo office, notifying them of the "[e]xtra security presence" at the Kalamazoo office such that security guards would be "more visible" and "frequently patrolling the office campus." (5/6/2016 Mem., ECF No. 106-1, PageID.782.) The memo also required all employees to wear their photo identification badge at all times. (*Id.*)

In addition, Defendant conducted two "town hall" meetings at the Kalamazoo office and the executive team traveled there personally to meet with leaders in the office. (Garcia Dep. 133.)

### H. Garcia, Bever, and Park Meet with Plaintiff and Terminate Her

Garcia and Bever arranged to meet with Plaintiff on May 9, 2016, to discuss her email usage.  Park attended the meeting via telephone.  Garcia had decided to terminate Plaintiff before the meeting, but he wanted to give Plaintiff an opportunity to provide a "better explanation" for her conduct.  (Garcia Dep. 144, 146.)  Garcia did not tell Plaintiff the reason for the meeting in advance, so she thought they were meeting to address State Farm's "problems when it comes to racism[,] discrimination[,] harassment[,] and retaliation against African-Americans and other employees."  (Campbell-Jackson Dep. 25.)  In particular, she thought State Farm was "still trying to unravel what had occurred with [the April 25 Letter.]"  (*Id.* at 26.)  She "had no idea" that Garcia was coming to discuss her conduct.  (*Id.*)

The four of them discussed the emails that Plaintiff had sent to her personal address or to other individuals outside State Farm.  (Campbell-Jackson Dep. 135, 140; Interview Summary, ECF No. 111-53.)[5]  Plaintiff apologized for sharing the SPI and confessed that she sent other business-related emails to her personal account.  (Interview Summary, PageID.1381.)  She explained her actions by saying that "she wanted to justify her performance" and that using her personal account "enabled her to conveniently print . . . materials at home."  (*Id.*)  For other instances, she said she was sharing compliments that she had received with her spouse and sister; she did not realize that her emails contained confidential claim information.  (*Id.*, PageID.1382.)  One email that she sent to herself contained a draft of a performance memo for a State Farm claims representative.  But Plaintiff explained that she was "just trying to work on the document at home and/or compile information."  (*Id.*)

---

[5] Although the Interview Summary contains statements that could be hearsay, the Court will consider it because Plaintiff has submitted the Interview Summary to support her response and Defendant does not object to its use.

Park told Plaintiff that approximately 4,700 emails sent in a 17-month period "appeared to be non-business-related correspondence," including communications with Plaintiff's family and emails concerning Plaintiff's involvement with external organizations.   (*Id.*, PageID.1383.)  Plaintiff responded that the external organizations were sponsored by State Farm and that her involvement with those organizations "furthered her duties at State Farm."  (*Id.*)  She agreed that some of her communications, such as those involving her church or a family reunion, were "personal in nature," but she said that she knew of other employees who used their email for non-business reasons.  (*Id.*)

Toward the end of the interview, Garcia told her that it was in State Farm's interest to "part ways" with her, meaning that Defendant was terminating her.  (Campbell-Jackson Dep. 140.)

## II.  PROCEDURAL HISTORY

Plaintiff filed a complaint with the EEOC on May 18, 2016, after Defendant terminated her.  (*See* Charge of Discrimination, ECF No. 4-2.)  The EEOC issued her a right-to-sue letter on September 16, 2021.  (Compl. ¶ 11, ECF No. 1.)  Plaintiff filed her complaint in this action on December 9, 2021, asserting violations of Title VII and Michigan's Elliot-Larsen Civil Rights Act ("ELCRA").  As the Court discussed in its previous opinion, Plaintiff's ELCRA claim is untimely.  (7/26/2022 Op. 5, ECF No. 37.)   In addition, Plaintiff did not exhaust all of her Title VII claims against State Farm through the EEOC process.  (*Id.* at 9-10.)

Plaintiff's remaining Title VII claims are (1) that Defendant terminated her in retaliation for complaining about discrimination and harassment at State Farm and (2) the April 25 Letter constituted unlawful harassment for which Defendant is liable.  Defendant argues that these claims are barred by laches and/or that Plaintiff has not provided sufficient evidence to survive summary judgment.

13

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id.* at 249.  The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

### IV. ANALYSIS

#### A. Title VII – Retaliation

Because Plaintiff offers no direct evidence of retaliation, the Court examines her claim through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that framework, she must establish a prima facie case of retaliation by showing

> (1) she engaged in activity protected by [Title VII], (2) the exercise of her [protected conduct] was known to [Defendant], (3) [Defendant] then took an adverse employment action against her, and (4) there was a causal connection between her protected activity and the adverse action.

*Kirkland v. City of Maryville*, 54 F.4th 901, 910 (6th Cir. 2022).  If she makes that showing, the burden shifts to Defendant to "articulate a legitimate, nonretaliatory reason for the adverse action." *Id.*  At that point, the burden returns to Plaintiff, "who must demonstrate that [Defendant's] proffered justification was pretextual." *Id.*

14

Plaintiff identifies her complaints about the April 25 Letter as her protected conduct.  (Pl.'s Resp. Br. 14-16, ECF No. 111.)  And she identifies her termination as the adverse action at issue. (*Id.*)

### 1. Protected Conduct

Defendant argues that Plaintiff did not engage in protected conduct.  Title VII's anti-retaliation provision makes it unlawful "for an employer to discriminate against any . . . employee[] . . . because [the employee] opposed any practice made an unlawful employment practice[.]" 42 U.S.C. § 2000e-3(a).  "The opposition clause protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014).  "Less formal protests that are still protected under Title VII include 'complaints to human resources personnel regarding potential violations of Title VII.'" *Redlin v. Gross Pointe Pub. Sch. Sys.*, 921 F.3d 599, 613 (6th Cir. 2019) (quoting *Laster*, 746 F.3d at 730).

Here, Plaintiff received a letter that appeared to be from a State Farm employee.  That letter contained racist statements and was a form of racial harassment, a potential violation of Title VII. Thus, her report about it is sufficient evidence of protected conduct.  *See Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505 (6th Cir. 2014) (report of sexual harassment was sufficient evidence of protected conduct).

### 2. Causation

Next, Defendant argues that Plaintiff has not established a causal connection between her protected conduct and the adverse action.  For causation, Plaintiff relies upon the temporal proximity between her complaint about the April 25 Letter and her termination two weeks later.

Temporal proximity can be sufficient to establish causation in some circumstances, but it is not sufficient here.  As the Court of Appeals has explained:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation.  But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Mickey v. Zeider Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).  The Court of Appeals has "made clear that a plaintiff can avoid summary judgment based on temporally proximity alone only in rare cases."  *Rudd v. City of Norton Shores*, No. 22-1229, 2023 WL 3886404, at *9 (6th Cir. June 8, 2023) (citing *Lemaster v. Lawrence Cnty.*, 65 F.4th 302, 310 (6th Cir. 2023); *Sensabaugh v. Halliburton*, 937 F.3d 621, 630 (6th Cir. 2019)).  This is not one of those cases.

Plaintiff's focus on the proximity between her April 25 report and her termination ignores her long history of complaints about discrimination and harassment at State Farm.  For years, she regularly complained to her supervisor and to human resources staff about discrimination, retaliation, and harassment by other employees, and during all that time she suffered no meaningful consequences.  Indeed, Dodson, who was her supervisor in 2016, had received such complaints as early as 2009 and again in 2015.  And Garcia, who was directly involved in Plaintiff's termination, had received similar complaints from Plaintiff as early as January 2016.  Yet Plaintiff contends that Defendant retaliated against her for the same type of conduct in April 2016.  In these circumstances, it is not reasonable to infer a retaliatory motive based solely on the temporal proximity between her complaints in April and her termination.

Plaintiff's causation argument is further weakened by the circumstances of her report. Several employees received the April 25 Letter, and many others in her office were aware of it before she reported it.  (*See* Campbell-Jackson Dep. 69.)  According to Plaintiff, "all of the clerical-level people" in her office, as well as another manager, learned about the letter after it arrived; the letter created "hysteria" and "was starting to circulate," which is why Plaintiff decided to

investigate and try to manage the situation. (*Id.* at 69, 79, 103.) And after Plaintiff reported the letter to Lipowski, he reported it to other managers at State Farm. It makes little sense that Defendant would retaliate against Plaintiff for reporting an event that was somewhat widely known when it happened, and then widely shared among managers almost immediately after her report.

In short, to establish causation, Plaintiff must provide some "other evidence" suggesting that her termination was an act of retaliation for protected conduct. *See Mickey*, 516 F.3d at 525. She has not done so. To the extent Plaintiff relies on the comment by McCabe in 2015 that Plaintiff was a "continual problem," that comment does not provide support for an unlawful retaliatory motive by Garcia, Dodson, or anyone else in 2016. Similarly, Garcia and Dodson's responses to Plaintiff's concerns about the April 25 Letter do not suggest a retaliatory motive. Instead, those responses simply indicate that they wanted Plaintiff to allow Defendant's other managers and human resources staff to manage Defendant's response to the incident. Finally, Dodson's "average" performance review in September 2015 does not suggest that anyone involved in Plaintiff's termination retaliated against her in May 2016. Plaintiff has not identified evidence that Dodson was involved in the termination decision. Furthermore, Plaintiff's belief that this review was motivated by Plaintiff's earlier complaints is unsupported. Accordingly, construing the facts in the light most favorable to Plaintiff, her retaliation claim fails for lack of evidence. She has not provided evidence to support a plausible inference that there was a causal connection between her protected conduct and her termination.

### B. Title VII – Harassment

Plaintiff's harassment claim under Title VII require her to establish that

(1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.

17

*Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011).

The first three elements are not contested.  It is less clear that the letter alone was sufficiently severe or pervasive to create a hostile work environment, though sometimes a single instance of severe harassment can meet that standard.  At any rate, Plaintiff fails to establish the final element, Defendant's failure to act.

Where, as here, the harassment was ostensibly committed by a coworker (as opposed to a supervisor), "the employer is liable only 'if it knew or should have known of the charged . . . harassment and failed to implement prompt and appropriate corrective action.'"  *Doe v. City of Detroit*, 3 F.4th 294, 301 (6th Cir. 2021) (quoting *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 348 (6th Cir. 2005)).  "To find liability, the employer's response to a coworker's harassment must 'manifest[ ] indifference or unreasonableness in light of the facts the employer knew or should have known.'"  *Id.* (quoting *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 338 (6th Cir. 2008)).  Generally, an adequate response is one that is "reasonably calculated to end the harassment."  *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999).  "Steps that would 'establish a base level of reasonably appropriate corrective action' may include promptly initiating an investigation . . . , 'speaking with the specific individuals identified . . . , following up with [the complainant] regarding whether the harassment was continuing, and reporting the harassment to others in management.'"  *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 814 (6th Cir. 2013) (quoting *West v. Tyson Foods, Inc.*, 374 F. App'x 624, 633 (6th Cir. 2010)).

Here, it is undisputed that Lipowski initiated an investigation by obtaining details from Plaintiff and then gathering and examining the letters.  Lipowski then sent a report to human resources staff and prepared a threat assessment identifying the individuals named on the envelopes.  Defendant also contacted the local police and increased the security presence at the

Kalamazoo office.  And Dodson followed up with Plaintiff the day after she received the letter.  In addition, about a week after the incident, Defendant instructed supervisors at the Kalamazoo office to inform their employees about the increased security presence, to convey Defendant's disapproval of the letter, to require employees to report any information about who was involved, and to notify employees that the consequences for involvement in sending the letter would be "very serious."  No jury could reasonably conclude that these actions were indifferent or unreasonable.

Plaintiff argues that Defendant did not investigate the incident with the intent to "put[] all of its employees on notice that it takes [harassment] seriously and will not tolerate harassment in the workplace."  *Doe*, 3 F.4th at 301 (quoting *Collette v. Stein-Mart, Inc.*, 126 F. App'x 678, 686 (6th Cir. 2005)).  On the contrary, Lipowski prepared a report of his initial findings and then distributed it to management.  About a week later, Director Anderson directed a group of managers in Kalamazoo to inform all their employees that the letter was unacceptable, that it was being investigated, and that they must report information about the letter's source.  Those instructions put employees on notice that actions like the April 25 Letter would not be tolerated.  The instructions were also reasonably calculated to end the harassing behavior.  Employees contemplating similar conduct would have to consider whether their coworkers would discover their involvement and then report it to management.

The *Doe* case is instructive.  There, the plaintiff received an anonymous, harassing letter.  After learning of it, the plaintiff's employer "immediately began an investigation, interviewed employees, took handwriting samples, and reiterated its zero-tolerance policy."  *Id.* at 302.  Those actions were reasonable, according to the Court of Appeals.  *Id.*  Here, Defendant took similar actions.  It immediately investigated the letter, interviewing Plaintiff the same day and then followed up with her the next day.  It also took possession of all physical copies of the letter, and

later reiterated its harassment policy to managers and affected employees.  And it increased security at the Kalamazoo office.  It did not take handwriting samples like the employer in *Doe*, but there is no evidence of any handwriting that was available for sampling.  The April 25 Letter was typed, as was the address information on the envelopes.

Plaintiff faults Defendant for not conducting a "forensic analysis," but it is not clear what such an analysis would have revealed.  Plaintiff and others had already handled the letters by the time Defendant became aware of them.  And in any case, an employee's dissatisfaction alone does not demonstrate failure to take appropriate action.  *Id.* at 302.  "[A] harassment victim may not dictate an employer's action against a co-worker."  *Id.* at 302-03 (quoting *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 874 (6th Cir. 1997)).

Plaintiff also criticizes Defendant for confiscating the physical copies of the letters and for instructing Lipowski to delete "emails and IMs" concerning the April 25 Letter.  (*See* Mem. to File, PageID.1360.)  In context, the latter instruction appears to be referring to emails and messages containing pictures that Lipowski had taken of the April 25 Letter.  (*See id.*)  Clearly, Lipowski did not delete all the emails concerning the letter because those emails are part of the Court's record.  Nevertheless, Plaintiff believes that Defendant was trying to hide the letter and "prevent it from being released to the public." (Pl.'s Resp. Br. 28.)  But even assuming Plaintiff is correct, Defendant had good reason for its actions.  As Plaintiff recognized when she collected copies of the letter from the mailroom, distributing the letter more widely might have caused additional, unnecessary harm.  Importantly, Defendant did not hide the existence of the letter or ignore its impact.

Plaintiff compares this case to *Jackson*, but that case is distinguishable.  There, the employer's only action in response to one employee's assault of another employee and to multiple

20

incidents involving the use of racial slurs was to post a "general bulletin" reminding employees not to discriminate. *Jackson*, 191 F.3d at 665. The employer never disciplined any employees responsible for the harassment. *Id.* But unlike that case, there were no employees that Defendant could discipline. The sender of the April 25 Letter remained anonymous. And Defendant did more than merely post a general bulletin about discrimination. Its statements and actions responded directly to the letter itself.

In passing, Plaintiff refers to a similar letter that Defendant apparently received after the first. (*See* Second Letter, ECF No. 111-63.) However, Plaintiff provides no evidence regarding the circumstances of the second letter. She does not indicate when or how Defendant received it or whether she was even aware of it at the time. And she does not argue that it constitutes another instance of harassment for which Defendant is liable.

Plaintiff apparently argues that the second letter is evidence that Defendant's response was ineffective, but an employer need not eliminate all possibility of harassment to avoid liability. The question is whether its response was "reasonably calculated" to end the harassment. Defendant's response to the April 25 Letter satisfies that standard. Indeed, there is only so much an employer can do to stop or deter an anonymous individual from sending harassing letters through the mail.

In short, Defendant is not liable for the April 25 Letter because it took prompt and appropriate corrective action. Accordingly, the Court will grant summary judgment in favor of Defendant on Plaintiff's harassment claim.

### C. Laches

Alternatively, State Farm argues that the Court should find that Plaintiff's Title VII claims are barred by the doctrine of laches. "The defense of laches 'requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" *Cleveland Newspaper Guild, Loc. 1 v. Plain Dealer Pub. Co.*, 839 F.2d 1147, 1153

(6th Cir. 1988) (quoting *Costello v. United States,* 365 U.S. 265, 282 (1961)).  This defense is

available in a Title VII action.  *Id.*  But "dismissal of a plaintiff's claim is an extreme result, and

should be accomplished only when the prejudice to the defendant can be avoided in no other way."

*Id.* at 1155.  Defendant has the burden to establish the defense.  *EEOC v. Watkins Motor Lines,*

*Inc.*, 463 F.3d 436, 439 (6th Cir. 2006).

> The timing of a Title VII claim depends, in part, on the status of EEOC proceedings.
>
> A Title VII claimant must file a claim with the EEOC (in a nondeferral state) within 180 days after the allegedly discriminatory act.  42 U.S.C. § 2000e-5(c).  Once EEOC proceedings have terminated and the agency issues its right to sue notice, the claimant has 90 days to file suit in federal court.  *Id.* at § 2000e-5(f)(1).  If, however, the EEOC proceedings are still in progress, a claimant may request a right to sue letter 180 days after filing of the charge.  *Id.*

*Cleveland Newspaper Guild*, 839 F.2d at 1150.  In other words, before filing a lawsuit, the claimant

must first file a complaint with the EEOC.  If the EEOC proceedings are not resolved 180 days

after the EEOC complaint is filed, then the claimant can request a right-to-sue letter from the

EEOC in order to proceed with a private lawsuit.  Nevertheless, "administrative resolution of

claims is the preferred method."  *Id.* at 1153.  And courts are reluctant to dismiss cases where the

EEOC is the one responsible for the delay.  *Id.*

Some factors that the Court of Appeals for the Seventh Circuit has considered when

assessing whether a plaintiff's delay in filing a Title VII claim was unreasonable include:  (1) the

plaintiff's readiness in filing a complaint; (2) the amount of time during which the plaintiff was

represented by counsel; (3) whether counsel assisted the plaintiff with the EEOC claim;

(4) whether it was apparent that no administrative resolution was imminent; (5) whether the

plaintiff could have requested a right-to-sue letter; and (6) what actions, if any, the plaintiff took

to prod the EEOC to resolve the administrative proceedings.  *See Jeffries v. Chi. Transit Auth.*,

770 F.2d 676, 680 (7th Cir. 1985).

The Court need not consider these factors because Plaintiff's claims fail on the merits.

## V. CONCLUSION

In summary, the Court will grant State Farm's motion because Plaintiff has not presented sufficient evidence to support her remaining claims of retaliation and harassment.  The Court will enter an order in accordance with this Opinion.  And because the Court's order will resolve all the remaining claims in this case, the Court will enter a judgment dismissing the case.


Dated: August 11, 2023                            /s/ Hala Y. Jarbou
                                                  HALA Y. JARBOU
                                                  CHIEF UNITED STATES DISTRICT JUDGE